IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

KAY A. McDONALD,

    Plaintiff,

vs.

No. Civ-01-1390 JP/RLP

JOANNE B. BARNHART,
Commissioner of Social Security,

    Defendant.

## UNITED STATES MAGISTRATE JUDGE'S
## ANALYSIS AND RECOMMENDED DISPOSITION[1]

1.    Plaintiff, Kay A. McDonald, ("Plaintiff" herein) filed an application for Supplemental Security Income Benefits on June 20 1997, alleging disability as of December 31, 1993, due to back injury and mental impairment.[2] (Tr. 118, 140). The application was denied at the first and second levels of administrative review and by an Administrative Law Judge following a hearing. (Tr. 88, 94, 234-246; 89, 100, 248-260; 18-35).

2.    Plaintiff appealed the ALJ's decision to the Appeals Council which declined review on November 2, 2001. (Tr. 6-7). The matter before this Court is Plaintiff's Motion to Reverse and Remand for a rehearing. [Docket No. 9]. For the reasons stated below, I recommend that Plaintiff's Motion be granted in part.

---

[1]Within ten (10) days after a party is served with a copy of these proposed findings and recommendations, that party may, pursuant to 28 U.S.C. §636(b)(1), file written objections to such proposed findings and recommendations. A party must file any objections within the ten (10) day period if that party seeks appellate review of the proposed findings and recommendations. If no objections are filed, no appellate review will be allowed.

[2]Plaintiff filed a previous application for benefits, which was denied on April 18, 1995. (Tr. 116-117, 87). Plaintiff did not seek review of this denial.



I.  Standard of Review

3.  This Court reviews the Commissioner's decision to determine whether the records contain substantial evidence to support the findings, and to determine whether the correct legal standards were applied. *Castellano v. Secretary of Health & Human Services*, 26 F.3d 1027, 1028 (10th Cir.1994). Substantial evidence is " 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.' " *Soliz v. Chater*, 82 F.3d 373, 375 (10th Cir.1996) (*quoting Richardson v. Perales*, 402 U.S. 389, 401, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971)). In reviewing the Commissioner's decision, I may not reweigh the evidence or substitute my discretion for that of the Commissioner, but I have the duty to carefully consider the entire record and make my determination on the record as a whole. *Dollar v. Bowen*, 821 F.2d 530, 532 (10th Cir.1987).

4.  The Commissioner has established a five-step sequential evaluation process to determine if a claimant is disabled. *Reyes v. Bowen*, 845 F.2d 242, 243 (10th Cir.1988). If a claimant is determined to be disabled or not disabled at any step, the evaluation process ends there. *Sorenson v. Bowen*, 888 F.2d 706, 710 (10th Cir.1989). The burden of proof is on the claimant through step four; then it shifts to the Commissioner. *Id.*

II.  Vocational and Medical Facts

5.  Plaintiff was born on November 3, 1954, and completed the 9th grade. (Tr. 118, 125). She has previously worked as a convenience store clerk and a housekeeper. (Tr. 125-126). She has a long history of mental health treatment dating back to 1980-1981 [3]

---

[3] During this time Plaintiff was variously diagnosed as suffering from anti-social personality disorder with some depressive and hypochondrial features (Tr. 295-299); an adjustment reaction with anxious mood and narcissistic/histrionic personality disorder (Tr. 192-193), and bi-polar disorder, manic. (Tr. 300-303).

6.  Plaintiff received therapy under the auspices of CASAA[4] from 1981-1984, and was treated with thorazine and lithium. She stopped attending CASAA in approximately 1984, quit taking prescription medication, began using street drugs and alcohol and sought no further treatment until 1990. (Tr. 230). She received psychiatric treatment/medication while imprisoned for one year on drug charges in 1992-1993. (Tr. 54, 230-231, 222, 224).

7.  Plaintiff was evaluated at the University of New Mexico Mental Health Center ("UNM" herein) on April 11, 1995. She described multiple stressors and reported feeling overwhelmed, panicky and scared. She was diagnosed with adjustment disorder with anxiety (Axis I) and cocaine abuse (Axis II) with a GAF of 55 (Axis V), and referred to CASAA for additional care. (Tr. 198).

8.  Plaintiff returned to UNM on November 6, 1996, complaining of nervousness, excessive sleep, increased anxiety, poor concentration and nausea. She requested a prescription for Paxil, which she stated had been beneficial in treating her symptoms in the past. Her diagnosis was amended to Major Depression, recurrent (Axis 1) and Antisocial Personality Disorder (Axis II), with a GAF of 51. She was given a prescription for Paxil and a follow up appointment for medical evaluation. (Tr. 222-224).

9.  Plaintiff returned to UNM on January 9, 1997, complaining that she had become increasingly irritable after stopping prescription medication three weeks earlier. The evening before admission she had become violent after binging on alcohol, and was placed in protective custody. She had adequate hygiene and grooming, was appropriately dressed, tearful with fair eye contact, alert and oriented x 3, anxious, reported good sleep with decreased energy over past 2-3 months, demonstrated a blunted/angry affect, and organized thought form. She was diagnosed with Major Depression,

---

[4]Center on Alcoholism, Substance Abuse and Additions. http://casaa.unm.edu.

recurrent (Axis 1) and Antisocial traits (Axis II) and assigned a GAF of 60. (Tr. 221), and given a prescription for Paxil. (Tr. 220).

10.     Plaintiff returned to UNM on February 18, 1997. She had not been able to take Paxil because of gastro-intestinal upset and vomiting, and complained of continued irritability, anger, mood swings, decreased sleep and appetite, constant feeling of upset and racing thoughts. Her condition was diagnosed as Dysthymia with anxiety, and she was given a prescription for Prozac. (Tr. 225).

11.     Plaintiff was evaluated by a psychiatrist, Dr. Carlos Balcazar, on November 6, 1997, at the request of the Disability Determination Unit. Plaintiff disclosed her prior legal and drug problems, but stated that she had not used street drugs since the prior December. She described her main problem as poor impulse control and that she "easily loses her temper and blows up." Dr. Balcazar conducted a mental status examination which disclosed no serious abnormalities.[5] He diagnosed Alcohol and drug abuse, in remission (Axis I) and Anti-social personality disorder (Axis II). Rather than assigning a numerical GAF, he stated "the optimal functioning during the course of the past year has been poor."[6] He concluded:

> I think that this woman has adequate judgement to plan a work sequence. From a psychiatric standpoint, she could use tools and materials for simple jobs as well

---

[5] "(Claimant) was appropriately dressed and her general appearance was clean. She was able to provide pertinent information. Both attention span and capacity to concentrate were preserved. She communicated affect and her mood was euthymic. Her emotional reaction was appropriate to the circumstances and content of thought. Both remote and recent memory were preserved. . . . She could perform simple mental arithmetical calculations, but, she missed after a few operations of serial sevens. Her answers to similarities and proverbs were on the concrete side. In my opinion, her intelligence is average. Her line of thought was goal-oriented and I could detect no loose associations, and no delusional thinking was present. Her sensorium was clear during the exam and she denied either past or present hallucinatory experience." (Tr. 232).

[6] Dr. Balcazar utilized the rating system published in the DSM-III, 1980, p. 28-29. Under that system, a rating of "poor" is indicative of marked impairment in either social relations or occupational functioning, or moderate impairment in both.

perform one- or two-step repetitive tasks at a competitive rate. Based on my contact with her, I would not foresee difficulty in her interaction with coworkers and supervisory personnel.

(Tr. 232-233).

12. Plaintiff sought substance abuse evaluation at UNM on January 5, 1998. She outlined a significant past history of drug use, and had used crack cocaine recently. She indicated that she was experiencing serious depression, anxiety and problems with sleep. She also stated that she had close friends and spent her free time with her friends and family. The counselor diagnosed Cocaine Dependence (Axis I) with a GAF of 65 and recommended outpatient therapy. (Tr. 265-270, 348).

13. Plaintiff attended two therapy sessions in January 1998 (Tr. 263-264), failed to attend the next two scheduled therapy sessions (Tr. 262-262), but did attend regular family and individual therapy sessions thereafter. (Tr. 321-380). The counseling records dating from February 1998 were not submitted to the ALJ, but were provided to the Appeals Council. A myriad of topics and concerns were discussed during these sessions, including drug relapse (Tr. 279), difficulties Plaintiff was having with her teenage son (Tr. 377-380), gambling (Tr. 348), domestic abuse and drug use involving her husband (Tr. 372, 371) and her manic-depressive behavior. (351, 348, 350, 346). Plaintiff was placed on trial of Lithium on April 23, 1998 (Tr. 347). In June, she was brought to the UNM-Mental Health Center by police officers following a domestic violence incident involving her husband. Plaintiff had stopped taking Lithium and was drinking alcohol. The care provider diagnosed Mood Disorder NOS and Ethanol abuse (Axis I) with a GAF of 60. (Tr. 370). Plaintiff continued attending group and individual counseling on a regular basis, addressing continued domestic abuse, family problems and financial difficulties. (Tr. 366-367, 337-342). Lithium was discontinued in September 1998 due to sporadic use and questionable response (Tr. 342), and she

was placed on Buspar, which helped her concentrate (Tr. 341, 338) and calmed her down. (Tr. 56). As of December 15, 1998, her counselor noted "client doing very good, managing her own life now that she is no longer in abusive relationship." (Tr. 365). Thereafter, counseling notes address problems stemming from Plaintiff's domestic situation. (Tr. 255-356, 358-362, 327-331, 333-334).

14. In addition to her mental condition, Plaintiff also contends that she is disabled because of a back condition, which she states limits her to lifting no more than 5-10 pounds. (Tr. 140). She was evaluated on June 13, 1997, by Emmett Altman, M.D., for complaints of low back pain that had worsened over the prior month. She did not complain of difficulty lifting, but stated that she had pain with prolonged sitting, had to change positions frequently, could walk 3-4 blocks and had a stiff and sore low back upon awakening. Based on physical examination and x-rays Dr. Altman diagnosed an unstable lumbosacral joint with increased lumbar lordosis, consistent with discomfort and pain with prolonged activities. He did not assign any exertional limitations. Six months later Plaintiff was seen at UNM-ER complaining of low back pain. She was referred to physical therapy. (Tr. 320). At her initial PT visit, she indicated that she "does housework/cooking when she sits down to rest the pain occurs. Stand 10-15 min. Walking is mostly ok." (Tr. 319). She attended three out of seven scheduled therapy sessions. (Tr. 317-319). Although Plaintiff continued to complain of back pain, there is no record of further medical treatment.

III. The ALJ's Decision

15. The ALJ determined, at step four of the applicable five-step sequential analysis, *see* 20 C.F.R. 404.920; *see also Williams v. Bowen*, 844 F.2d 748, 750-51 (10th Cir.1988), that Plaintiff was not disabled because she retained the residual functional capacity for simple, routine, non-public jobs that required only minimal contact with co-workers and supervisors, and therefore could

perform her past relevant work as a private housekeeper. (Tr. 29-31). The exertional requirements for this job were defined as "medium." (Tr. 29).

IV. Issues on Appeal

16. Plaintiff contends that:

A. The ALJ relied on incomplete records in concluding that Plaintiff had sought no mental health care after May 28, 1999, thereby undermining his findings on credibility and the severity of Plaintiff's mental impairment;

B. The ALJ erred in arriving at his credibility finding by discrediting Plaintiff based to behaviors which are in fact symptoms of her underlying mental illness; and

C. The ALJ erred in finding that Plaintiff could return to her past relevant work as a housekeeper's because:

1. No evidence of record supports the ALJ's determination that Plaintiff has the physical RFC for medium work;

2. The ALJ did not comply with the narrative discussion requirements of S.S.R. 96-8p with regard to Plaintiff's physical RFC;

3. The ALJ relied on an inconsistent report by Dr. Balcazar in assessing Plaintiff's mental RFC.

V. Analysis

A. The ALJ did not misstate the record.

17. In his decision, the ALJ stated that the record before him documented no evaluation or treatment for mental problems after Plaintiff failed to attend to therapy sessions in early 1998 (Tr. 24), and that her treatment regimen had been inconsistent and frequently noncompliant. (Tr. 27). Plaintiff contends that this is a misstatement, and that had the ALJ obtained more current records, he would have had before him evidence of consistent group and individual counseling. She does not raise as an issue, however, any failure by the ALJ to properly develop the record.

18. The ALJ's comment was accurate as it related to the record before him. More importantly,

however, the ALJ did not find that Plaintiff had not sought additional mental health care. He accepted as true her testimony that "she is currently in counseling and is taking the anti-depressant drug, Buspar. . . (and that) this regimen has helped her to make a lot of progress in terms of her ability to cope with her emotional problems. . ." (Tr. 27). The ALJ's finding is, in fact, supported by the records submitted to the Appeals Council (See ¶ 13, supra) and Plaintiff's testimony (Tr. 56, 62). Accordingly, I find that the ALJ did not misrepresent the record.

B. The ALJ did not err in assessing Plaintiff's credibility.

19. Plaintiff contends that the ALJ may not rely on conduct that is or can be a symptom of an underlying mental health condition to discredit Plaintiff's credibility. She cites to no authority which directly supports this contention, and the Court is aware of none.

20. In reviewing the ALJ's credibility determination, the Court should "defer to the ALJ as trier of fact, the individual optimally positioned to observe and assess witness credibility." *Casias v. Sec'y of Health & Human Serv's*, 933 F.2d 799, 801 (10th Cir. 1991). "Credibility is the province of the ALJ." *Hamilton v. Sec'y of Health & Human Serv's*, 961 F.2d 1495, 1499 (10th Cir. 1992). At the same time, the ALJ must explain why specific evidence relevant to each factor supports a conclusion that a claimant's subjective complaints are not credible. *Kepler v. Chater*, 68 F.3d 387, 391 (10th Cir. 1995); *but see Qualls v. Apfel*, 206 F.3d 1368, 1372 (10th Cir. 2000) (*Kepler* does not require formalistic factor-by-factor recitation of evidence.) "Findings as to credibility should be closely and affirmatively linked to substantial evidence and not just a conclusion in the guise of findings." *Id. (quoting Huston v. Bowen*, 838 F.2d 1125, 1133 (10th Cir. 1988) (footnote omitted)). "In making a finding about the credibility of an individual's statements, the adjudicator need not totally accept or totally reject the individual's statements. *See Social Security Ruling 96-7p*, 61 Fed.

Reg. at 34486. Rather, the ALJ "may find all, only some, or none of an individual's allegations to be credible." *Id.*

21. Review of the ALJ's decision demonstrates that many factors were considered by him in evaluating Plaintiff's credibility, including:

-- Plaintiff has a back condition for which she has sought little treatment, and had failed to follow through with prescribed therapy session in 1998. (Tr. 25-26, citing to Tr. 228, 320, 247, 317-319)

-- Plaintiff listed no current medication or treatment for her back condition. (Tr. 26, citing to Tr. 188).

-- Plaintiff's mental status examinations have revealed no significant levels of dysfunction in orientation, cognition, memory, concentration, judgment and ability to attend to tasks, and her GAF ratings have ranged from 51-65, denoting a moderate to mild level of symptom severity. (Tr. 26, citing to Tr. 198, 221-223, 232, 285),

-- When evaluated for complaints of extreme depression in January1998, Plaintiff did not appear obviously depressed or anxious. (Tr. 26, citing to Tr. 285).

-- Plaintiff's alleged impairments have had relatively little impact on her daily activities. She lives with her teen aged son and takes care of basic household tasks (cleaning, cooking, paying bills, shopping). In her spare time she watches television, plays bingo, shops with her daughter, and visits her children and grandchildren. (Tr. 27, see Tr. 47, 59, 63-64, 67-69).

-- In January 1998, Plaintiff stated that over the prior 30 days she had experienced no significant interpersonal problems, and no significant difficulties keeping house, shopping, preparing food, keeping appointments or making friends. (Tr. 27, citing to Tr. 283-286).

I find that the record provides substantial evidence in support of the ALJ's credibility determination.

C. <u>The ALJ did err in assessing Plaintiff's physical residual functional capacity.</u>

22. The ALJ found that Plaintiff suffered from "severe" low back pain (Tr. 21). By definition, such an impairment "significantly limits" Plaintiff's ability to do basic work activities. 20 C.F.R.

§416.920. The ALJ also found, however, that Plaintiff's back condition "caused no significant physical limitations." (Tr. 26). These findings are inconsistent, and can not be reconciled, particularly in view of the fact that the record contains no evaluation of Plaintiff's physical residual functional capacity ("RFC" herein) by an examining or non-examining physician.

23.  This inconsistency also undermines the ALJ's findings at step four of the sequential evaluation process. The ALJ determined at step four that Plaintiff retained the RFC for her past job as a private housekeeper, which a vocational expert defined as requiring medium exertional ability.[7] (Tr. 29, 31). In *Winfrey v. Chater*, the 10th Circuit delineated the three phases of a step four determination: First, evaluation of a claimant's physical and mental RFC; second, determination of the physical and mental demands of the claimant's past relevant work, and third, assessment of the claimant's ability to meet the job demands found in phase two, despite the limitations found in phase one. Id. at 1023. Social Security Ruling 96-8p requires that the RFC assessment include a function-by-function assessment of physical[8] and mental capacities. S.S.R. 96-8p *3. Further, the ALJ's opinion must "describe the maximum amount of each work related activity the individual can perform based on the evidence in the record. Id. at *7. The ALJ's opinion contains no such assessment of Plaintiff's physical capabilities. I conclude that because the ALJ found that Plaintiff had a "severe" impairment of low back pain, he could not by-pass the analysis required by *Winfrey* and S.S.R. 96-8p.

---

[7]"Medium work involves lifting no more than 50 pounds at a time with frequent lifting or carrying of objects weighting up to 25 lbs." 20 C.F.R. §416.967(c).

[8]Sitting, standing, walking, lifting, carrying, pushing and pulling.

### D. The ALJ did not err in assessing Plaintiff's mental residual functional capacity.

24. Finally, Plaintiff contends that the ALJ erred in evaluating her mental RFC because he relied upon an inconsistent report prepared by Dr. Balcazar. Specifically, Plaintiff contends that Dr. Balcazar's diagnosis (Alcohol and drug abuse, in remission and Anti-social personality disorder) and GAF rating (poor) are inconsistent with his conclusions regarding her mental residual functional capacity, and that the ALJ should have obtained a complete functional assessment from Dr. Balcazar to explain the inconsistency.

25. Dr. Balcazar's diagnosis and findings regarding Plaintiff's mental functioning are set out in ¶ 11, supra. These findings were acknowledged by the ALJ, who explained why he did not accept the GAF rating of "poor," stating:

> . . . I find this low estimate quite inconsistent with Dr. Balzazar's own clinical findings. He reported an essentially normal mental status examination, with intact functioning in every area. He even described the claimant's mood as euthymic[9] He said in his opinion she was able to plan a work sequence, do simple jobs and interact appropriately with coworkers and supervisors. It is clear from his overall findings that Dr. Balcazar considered the claimant capable of simple work activities, with no more than mild to moderate limitations in any area of social, occupational or intellectual functioning.

(Tr.26-27).

26. The ALJ cited to other evidence of record to support his mental RFC assessment. In terms of assessing Plaintiff's GAF, he cited to evaluations by care providers indicative of mild to moderate impairments in social and/or occupational functioning.[10] (Tr. 26, see Tr. 198, 223, 221, 270). The

---

[9]This meant that Plaintiff's mood was moderate, not manic or depressed. *Stedman's Medical Dictionary*, at 627 (27th Ed.2000) (defining "euthymia" and "euthymic")

[10]These GAF ratings, one each from 1995, 1996, 1997 and 1998 range from 51-65. According to the Diagnostic and Statistical Manual of Mental Disorders, Fourth Edition, p. 32, a GAF rating of 51-60 is indicative of "moderate symptoms . . . or moderate difficulty in social occupational or school functioning," while a GAF rating of 61-70 is indicative of "some mild symptoms. . . or some difficulty in social,

ALJ has the duty to weigh evidence and resolve any evidentiary conflicts, and I will not reweigh the evidence. *Rutledge v. Apfel*, 230 F.3d 1172, 1174 (10th Cir.2000). Finally, the ALJ cited to evaluations by non-examining agency physicians (Tr. 28), who in narrative opinions based on record review found Plaintiff capable of routine, non-public work (Tr. 250), or work that did not involve much social interaction. (Tr. 236). The findings regarding the nature and severity of an impairment made by state agency consultants and other program physicians and psychologists "must be treated as expert opinion evidence of nonexamining sources." Soc.Sec.Rul. 96-8p, 1996 WL 374180, at *1.

27. I find that the ALJ's evaluation of Plaintiff's mental residual functional capacity is supported by substantial evidence and the application of correct legal principles.

VI. Recommended Disposition

28. For the reasons stated above I recommend that Plaintiff's Motion to Reverse and Remand for Rehearing be granted in part, and that this matter be remanded to the Commissioner for additional proceedings in order to properly assess Plaintiff's physical residual functional capacity. I further recommend that the Commissioner's findings related to credibility and Plaintiff's mental residual functional capacity be affirmed.

RICHARD L. PUGLISI
UNITED STATES MAGISTRATE JUDGE

---

occupational, or school functioning . . . but generally functioning pretty well, has some meaningful interpersonal relationship."